Filed 4/14/16  P. v. Quezada CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069446 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1400899) |
| ALEX VINCENT QUEZADA, SR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed in part, reversed in part.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Alex Vincent Quezada, Sr., was charged in a first amended information with murder (Pen. Code, § 187, subd. (a)(1);[1] count 1) and with being a felon in possession of a firearm (§ 29800, subd. (a); count 2).  It was further alleged that defendant in count 1 personally and intentionally discharged a firearm, which caused great bodily injury and death to the victim (§ 12022.53, subd. (d)) and that defendant in counts 1 and 2 committed murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1) & (4)).

The jury found defendant guilty of first degree murder and found true defendant personally and intentionally discharged a firearm causing death, as charged in count 1. The jury was unable to reach a unanimous verdict on the gang allegation in count 1, which was subsequently dismissed.  The jury also found defendant guilty of being a felon in possession of a firearm, and found true the gang enhancement, as charged in count 2. The court sentenced defendant to 25 years to life on his murder conviction, plus 25 years for the personal discharge of a firearm enhancement.  The court also sentenced defendant to a consecutive three years in prison for being a felon in possession of a firearm, plus four years for the gang enhancement.

First, defendant contends the court abused its discretion and thus erred when it ruled to admit incriminating statements he made during two station house interviews with police because they allegedly were coerced and thus involuntary.  Second, he contends there is insufficient evidence to support the true finding on the gang enhancement in

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

count 2. We disagree with his first contention but agree with his second contention that there is insufficient evidence in the record to support the gang enhancement.

FACTS

In the evening of March 7, 2014, defendant took his long-term girlfriend, Maria Lopez, and his girlfriend's teenage daughter, Esperanza Beltran (whom defendant referred to as his wife and daughter, respectively), to a residence in Hesperia in order for Lopez and Beltran to get matching mother-daughter tattoos. The tattoo artist was Johnny Monroy. At the time, Monroy was living with his mother, his sister, and his mother's friend at a house located on Avenal Street.

On the day of the shooting, victim Ronnie Mena was also at the house. Monroy testified that he had known Mena for about 20 years and that they were good friends. After arriving sometime around 1:00 or 2:00 p.m., Mena, Monroy's sister, and Monroy's mother's friend consumed nearly all the whiskey from what Monroy described was a "very big bottle."

Monroy testified that defendant, Lopez, and Beltran arrived at the house at about 7:15 p.m. Monroy previously had tattooed defendant's chest. Monroy sent defendant to a tattoo shop to buy some additional supplies for the matching tattoos. After defendant returned, Monroy spent about 30 minutes tattooing Lopez. At some point during the process of tattooing Lopez, they discovered that Monroy had left the letter "H" out of "daughter" on Lopez's tattoo. Monroy testified Lopez was upset about the mistake and "said something." Mena, who was sitting in the room, in response told Lopez, "If you don't like it, you can leave[.]" Monroy fixed the tattoo and then took a cigarette break.

3

At or near the time Monroy took a break, Mena joined defendant outside to smoke a cigarette. Monroy testified thereafter he opened his front door because he noticed the front porch light—which was always on at night—had been turned off. Monroy saw defendant and Mena outside and heard them "having a disagreement." Specifically, Monroy heard Mena ask defendant if defendant had a "problem with him [i.e., Mena]."

Minutes later, while still working on Lopez's tattoo, Monroy said he heard a "pop" sound. Thinking Mena had dropped something, Monroy stopped working, but, when he found Mena was not inside the house, Monroy returned working on Lopez's tattoo. Shortly thereafter, Monroy heard several more similar popping sounds that were close by the house. Because the sounds were "back to back," Monroy concluded they were gun shots and knew "something wasn't right."

Monroy testified that shortly after hearing gunshots, his neighbor called asking if Monroy also had heard the shots. Knowing that Mena was outside and the gunshots sounded nearby, Monroy called Mena's cell phone, but Mena did not pick up. Monroy also text messaged Mena's phone but received no response. Meanwhile, Lopez and Beltran were sitting in the tattoo room. While Monroy was getting ready to begin Beltran's matching tattoo, Lopez said Beltran had "some things to do" and they left.

Monroy testified he saw defendant with a gun on Valentine's Day when defendant had come over to hang out with Monroy's brother, Armando "Mondo" Monroy (Mondo). According to Monroy, his brother Mondo was a member of the Bassett Grande criminal street gang. Monroy testified he also used to be in a gang called 18th Street but had stopped affiliating with any gangs at the time of the shooting. On Valentine's Day,

4

Monroy saw defendant pull out a .40-caliber stainless steel gun with black grips from the waistband of his pants and heard defendant say his wife had bought the gun for him as a Valentine's Day present.

After Lopez and Beltran left, Monroy told his sister to call defendant and inquire about Mena. With the "speaker phone" feature turned on, Monroy's sister called defendant. When Monroy's sister asked defendant where Mena was, defendant denied knowing who Mena was and when she clarified it was the "guy you [i.e., defendant] were just outside having a cigarette with," defendant claimed that man "got a phone call and walked the other way." Defendant also told Monroy's sister he had gotten into an argument with his wife and thus was walking home. Because Monroy had not observed or heard any argument between defendant and his wife, Monroy concluded defendant was lying.

Monroy's neighbor, Dennis Flittner, testified he was getting ready for bed at about 10:30 p.m. on the night of the shooting when he heard loud voices outside his front door that he described as two males "arguing." Flittner in response turned on his front porch light, went outside and saw two faint silhouettes, slightly separated, walking in the street. Flittner also saw a faint light—which he described as similar to a light from a cell phone—moving away from his house. Flittner could not hear what was being said except for the words, "Hey Shorty." Because Flittner assumed the two males were "taking their argument somewhere else," he went back inside.

After Flittner got into bed, he heard four or five gunshots. The gunshots sounded close to Flittner's house. Flittner got dressed and went outside. As soon as he went

5

through his front door, he heard someone running. Concerned for his own safety, Flittner crouched down and saw a silhouette run past him, westbound, carrying that same faint light he had seen earlier.

Detective Jeffrey Allison of the San Bernardino County Sheriff's Department testified that on the night of the shooting, he responded to the call of shots fired about 11:00 p.m. Using the spotlight on his marked patrol car, Detective Allison saw a body lying in the dirt beyond the paved portion of the road. Detective Allison approached the victim by walking through some vegetation to avoid making any additional shoe prints in the dirt. He saw no signs of life. The victim appeared to have two bullet wounds to the lower back and a bullet wound to the head. A scent-tracking dog was subsequently brought to the crime scene. The dog led the deputies to the front door where Monroy lived.

Esperanza Beltran testified on the night of the shooting she, defendant, whom she referred to as her stepfather, and her mother went to get matching tattoos that said, "A Bond Between a Mother and Her Daughter is Forever." Because Monroy needed supplies for his tattoo gun, Beltran said they waited about three hours in the living room before he was able to start on her mother's tattoo. While they waited, the victim also sat in the living room. Beltran recalled the victim was drinking "a lot" and was getting more "talkative" as a result. After Monroy finished Lopez's tattoo, they left without defendant. Beltran testified they left because she was tired, it was late, and she did not particularly like Monroy's artistry.

6

Beltran testified that when she was first interviewed by detectives about the shooting, she did not tell them the entire story. She testified that while defendant was outside smoking a cigarette, her mother tried to take a picture of her new tattoo; that Mena asked her mother if she wanted to use his phone to take the picture because it had a better camera; that her mother in response politely said, "No thank you. Mine's just fine"; and that Mena in turn responded, "If you don't want to use my [¶] . . . [¶] fucking camera, then you don't have to."

Beltran testified her mother was upset by Mena's comment, which Beltran found "disrespectful." Her mother told Mena "not to disrespect her because she's not disrespecting him," or words to that effect. According to Beltran, Mena left the room.

During an interview with detectives shortly after the shooting, Beltran stated defendant came back inside and her mother told defendant what Mena had said. Defendant next went looking for Mena inside the house. Beltran told detectives she next saw her mother, defendant, and Mena go outside, and only her mother return. As she was getting ready for her tattoo, Beltran told detectives her mother received a call from defendant. Beltran testified as soon as her mother received that phone call, her mother stated, "We have to leave." Beltran admitted on the way home she worried about defendant because he was not with them in the car.

Beltran told detectives her mother instructed her during the drive home "not to say anything to anyone" and to say she "did not know anything." Beltran also told detectives that on the night of the shooting, while defendant was lifting up his shirt to show Mena some scars, she saw a black handgun in defendant's waistband. She next saw defendant

7

pull the handgun out and put it in his front pocket. Beltran testified to these same facts at the preliminary hearing, but at trial stated the handgun she thought she saw on the night of the shooting was probably just defendant's belt.

During the interview, Beltran also told detectives that it was not uncommon for defendant and defendant's mother to wear the same shoes and that shortly before defendant called Lopez and told them to leave, he sent Lopez a text message stating he was going to fight Mena in a field because Mena had disrespected Lopez.

Detective Gary Hart of the San Bernardino County Sheriff's Department testified he interviewed Beltran following the shooting of Mena. That interview was recorded. Detective Hart testified after Mena disrespected Lopez, Beltran said that defendant returned from smoking a cigarette; that Lopez told defendant she had been disrespected; that defendant in response contacted Mena in another room; that Beltran heard the two men arguing loudly and at one point may have heard someone say, "Why did you do that?"; that Lopez, Mena, and defendant initially all went outside and shortly thereafter, only Lopez came back inside; that sometime thereafter, defendant called Lopez and said he was going to fight Mena in a field for disrespecting Lopez; and that a short time later, defendant called Lopez a second time and told them to "leave the house."

With regard to the gun, Detective Hart testified Beltran said during the interview that defendant owned a gun; that she had seen him with a gun one other time; that on the night of the shooting, she had seen him with the gun; and that before the shooting, while defendant was showing Mena some "taser marks" or scars, he lifted his shirt and she saw the gun.

8

Detective Hart participated in the search of defendant's house. During the search, detectives found defendant's mother wearing a pair of K-Swiss tennis shoes that matched shoe-print impressions found in the dirt at the crime scene. In fact, Detective Hart testified the word "K-Swiss" was visible in the dirt near where the victim died. During his interview of Beltran, she indicated defendant and his mother sometimes traded shoes because they had the same shoe size. Beltran also told detectives that she believed defendant returned home on the night of the shooting because she heard the front door open and close and heard someone go upstairs, where defendant and Lopez slept.

Lopez testified that when she first met Mena on the night of the shooting, she thought he was intoxicated or mentally ill based on his behavior; that while she was being tattooed, he came in and out of the room; that as the tattoo was being completed, she saw a letter was missing in the word "daughter"; and that while she was trying to take a picture of her tattoo with her phone, Mena said he could take a better picture with his phone. When Lopez engaged Mena in "general conversation" about his phone, according to Lopez, Mena "got really pissed and started yelling at me [i.e., Lopez] and . . . said, Does it fucking matter what kind of? You either fucking want it or you don't."

Lopez testified that she told Mena not to be rude and that his behavior frightened her. At some point, defendant came back into the house. Lopez told defendant what had happened between her and Mena. Lopez testified they left without her daughter Beltran getting a matching tattoo because her daughter had "things to do the next morning."

Lopez also testified they left Monroy's house without defendant and the last time she saw defendant that night was when he was outside in front of the house. Lopez stated

9

she and defendant text messaged each other throughout that night because defendant had not come home. Lopez admitted purchasing a .40-caliber Ruger at a gun show sometime near Valentine's Day, 2014.

Detective Edward Bachman of the San Bernardino County Sheriff's Department testified he interviewed Lopez at the police station following the shooting. During the interview, Lopez told detectives that Mena had been disrespectful after they argued about who had a better phone to take a picture of her new tattoo. According to Detective Bachman, the argument escalated to the point Lopez wanted defendant to fight Mena.

Detective Edward De La Torre of the San Bernardino County Sheriff's Department testified he also participated in the execution of a search warrant of defendant's house. In the garage, Detective De La Torre saw a big screen television that appeared to have been tampered with. On investigation, Detective De La Torre found a Ruger gun case inside the television. The gun case did not contain a firearm. Inside an ice chest in the garage, Detective De La Torre found a box of ammunition with some of the ammunition missing. The ammunition included the "headstamp" "Win .40 S&W."

Crime Scene Specialist Carol Fostore of the San Bernardino County Sheriff's Department testified she arrived at the homicide scene around 12:45 a.m. Fostore found a "shoe trail -- left and right shoes -- walking from the south of the body up to the body, and actually stepped over the body -- appeared to straddle it, and then it left in a direction west of the body -- northwest of the body." Fostore also found two prints "straddling the body," near the victim's waist.

Near the victim, Fostore saw the brand name "K-Swiss" in the heal of shoe impressions left in the dirt. Fostore testified after she processed the crime scene, she went to defendant's house where detectives were executing a search warrant. At defendant's house, she found a shoebox with a receipt for a pair of K-Swiss men's shoes, size seven and a half. Also at defendant's house, she observed an individual wearing a white pair of K-Swiss shoes. The sole of those shoes visibly matched the shoe impressions left in the dirt at the homicide scene.

Fostore found six expended bullet casings at the crime scene. Each of the six casings had the headstamp "Win .40 S&W." Four of the casings were located somewhat away from the body and were in a "linear fashion." Fostore stated that as the gun was firing, it was "kicking . . . out" the expended casings; that each of the four casings was fired from about the same distance, although the location of the four casings showed some "movement and advancement"; and that two other casings were found "very close" to the body. Based on the shoe impressions that were straddling the body and the location of the two casings near the body, Fostore opined the shooter was bent over the victim's body when the shooter fired two bullets into the back of the victim's head from close range. Fostore found no weapons on the victim.

Also near the body was a "dirt disturbance" that, according to Fostore, was "consistent with a scuffle -- someone standing there, shoes -- it was like a half circling motion as if someone was turning -- feet were turning . . . in like a pirouette motion."

Fostore processed the Ruger's owner's manual found inside the television. Fostore obtained a "positive result" or fingerprints on the cover, back page and on at least one

11

other page inside the manual. The parties stipulated the latent fingerprint impressions identified from the manual belonged to defendant.

Deputy Medical Examiner Glenn Holt testified he performed the autopsy on Mena's body. Dr. Holt testified that Mena had been shot four times; that one bullet entered the left side of Mena's forehead, with the trajectory being front to back and slightly downward; that another bullet entered the left side of the victim's body, near his nipple, with a similar trajectory as the bullet to the forehead; that a third bullet entered the victim's left flank; and that a fourth bullet entered the back of the victim's head, with a trajectory of back to front. Dr. Holt testified Mena's blood alcohol level at the time of his death was .24 percent.

## DISCUSSION

## I

## Defendant's Confession

A. *Additional Background Regarding the Station House Interviews*

During motions in limine, the court conducted an Evidence Code section 402 hearing to determine the admissibility of defendant's statements to detectives during two station house interviews. The record shows Detective Bachman was called as a witness and stated that during their first interview with defendant—before his arrest—they explained to him at "several points . . . that [defendant] was not in custody, that [they] were investigating a shooting, and that [they] wanted to obtain a voluntary statement from him." Detective Bachman stated defendant did not ask to leave; that defendant was not handcuffed; that he was allowed to take "smoke breaks" during this first interview;

12

that he did not question whether he was under arrest; and that he freely agreed to speak to detectives, even though he did not know what information he could provide about the shooting. Detective Bachman estimated they initially spent about one or two hours interviewing defendant.

At the conclusion of the first interview, defendant was arrested. After a break, defendant was interviewed postarrest by two other detectives from the San Bernardino County Sheriff's Department including Detective Jose Avila, who also testified at the Evidence Code section 402 hearing. Detective Avila stated that he read defendant his *Miranda*[2] rights before the second interview; that defendant understood those rights; and as discussed *post*, that at one or two points during the interview defendant asked *if* he wanted an attorney, whether the attorney could be present "right now."

During the hearing, defense counsel confirmed that the main concern regarding the admissibly of defendant's statements involved a period of "five or ten minutes" between the time defendant was arrested and when he was given the *Miranda* warning. According to defense counsel, the detectives continued to talk to, and ask questions of, defendant during this five- or 10-minute period. When asked about the nature of this conversation during this five- or 10-minute period, Detective Avila stated they were informing defendant they had been working the case, they had interviewed Lopez and Beltran, and they had searched his house. According to Detective Avila, it was "small talk about his involvement in the homicide, and what we had done up to the point that we contacted

---

2    See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

13

him." Although Detective Avila doubted defendant made any statements during this short period of time, the court ruled none of the pre-*Miranda* statements made by defendant during the second interview were admissible.

During trial and outside the presence of the jury, the record shows the prosecutor raised the issue of coercion from defendant's second interview, when defendant confessed to the crime. The record shows the following colloquy took place:

"[Prosecutor]: [I]n the middle of the interview, there was reference to the fact that the defendant, girlfriend, and stepdaughter were in the crosshairs of the investigation; and that during that, [defendant], then, requested of Detective Wijnhamer a statement in writing that they would go home --

"[Defense Counsel]: Be allowed to go home.

"[Prosecutor]: -- be allowed to go home -- . . . . [¶] . . . [¶]

"[The Court]: Okay, what's the reason for you bringing this up now . . . .?

"[Prosecutor]: As I was reviewing and editing the transcript to create the court exhibit, it reminded me of that transaction. . . . [S]omeone could interpret that as somehow coercive and change the nature of the *Miranda* waiver that was already taken in the fact that it happens four -- five -- six pages into it."

The record shows after the court reviewed this portion of the transcript, the prosecutor asked the court to revisit its original ruling to ensure the confession was not coerced. The record further shows defense counsel "submit[ed]" on the issue, noting his reading was "they wrote what he asked them to write, and they wrote it down, and my client thought they were there. They weren't there. He asked them. It was already a done deal -- fait accompli." Nonetheless, defense counsel objected on the grounds the statements were coerced. The court took the matter under submission, noting it wanted to review case law on the issue.

14

The record shows that in revisiting the issue, the court found defendant's statements were not coerced. Specifically, the court found:

"In this particular case, we have the statement of [defendant] on page 5, line 9 -- this is the first time it really comes up -- 'How do I get my girls out of this shit?' The case[]law is pretty clear that the fact that somebody is motivated, in some part or even in whole part, to free someone else from potential prosecution is not something that renders a statement involuntary. The fact that [defendant] wished to free his . . . putative spouse and putative . . . stepdaughter . . . from possible criminal exposure for criminal liability is not the basis for finding his statement to have become less than voluntary. Wasn't a bargaining chip laid out there by the police officers -- it was something that he was told that if he cooperated, they'd go home. . . .

"In this case, the daughter and the putative spouse were both gone, already. They were not specifically under arrest. I considered the fact that he was under the impression that they were under arrest, and that is something that someone could argue was some level of pressure, but I don't feel that was the kind of motivation that caused him to enter into an agreement. He'd already entered into an agreement. He'd already waived his rights, and I don't find that there was a reward that was promised, that that was the reason that he decided to keep going with his statements to the deputies, even though it was clear -- or the detectives -- even though it was clear that that was one of his motivating factors. It wasn't the basis of the reward or promise of leniency for them that was the motivation for his continuing statements.

"So I'm going to find it was voluntary and is admissible."

15

B.  *Guiding Principles*

The law governing voluntariness of confessions is well settled.  " 'Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' "  (*People v. Perez* (2016) 243 Cal.App.4th 863, 878.)  As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession.  (*Ibid*.)

"In reviewing the trial court's denial of a suppression motion on . . . involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " '  [Citation.]  Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review."  (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).)

" ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." '  [Citation.]  The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he [or she] confessed.' " '  [Citation.]  In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including ' " 'the crucial element of police coercion,' " ' the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health."  (*Duff, supra,* 58 Cal.4th at pp. 555-556.)

" 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked. [Citation.]' " (See *People v. McWhorter* (2009) 47 Cal.4th 318, 347 (*McWhorter*).)

C. *The First Interview*

Although defendant primarily relies on statements made by police during the second station house interview (discussed *post*) to show his confession was coerced, he nonetheless contends the detectives were "baiting him with implied threats and promises since he first arrived at the station."[3]

---

[3]  Defendant in his opening brief initially argued he received ineffective assistance of counsel based on defense counsel's alleged failure to object to the admission of incriminating statements he made during the station house interviews. However, in his reply brief, defendant agreed with respondent that defense counsel had in fact objected to the admission of such statements. Defendant nonetheless contends the court erred in admitting the incriminating statements because they were coerced. Because the issue of coercion was, according to defendant "fully briefed" in his opening brief (albeit in connection with prejudice and the ineffective assistance claim), defendant argues he was not raising an issue for the first time in his reply brief. We agree and therefore reach the merits of this issue. (See *People v. Peevy* (1998) 17 Cal.4th 1184, 1206 [noting a contention generally "may not be raised for the first time in a reply brief"].)

17

1. Additional Background

The video of defendant's station house interviews was played for the jury. The record shows during the first interview that defendant denied any knowledge of the shooting; that he admitted to detectives knowing Monroy through Monroy's brother, Mando; that he acknowledged going with Lopez and Beltran to Monroy's house a day earlier so they could get matching tattoos; and that he left Monroy's house and walked for hours to the location of his work release program, after he and Lopez argued on the front porch of Monroy's house because Lopez allegedly was having an affair with defendant's little brother.

Detectives told defendant during the first interview that they were pretty certain defendant knew about the shooting they were investigating; that detectives already had spoken to Lopez and Beltran; and that they wanted to hear defendant's "side of the story." When defendant continued to deny any knowledge of the shooting, detectives told defendant that they already knew he was in the area when it happened and that they would prefer not to call Lopez and Beltran "liar[s]."

After defendant took a smoke break, detectives made the following comment to defendant:

"I appreciate you coming down to rap with us dude um like I said man like we've spent the whole time talking to your-your old lady man like um all I'm asking is for your honesty Alex all right shit can be explained and I don't want, I don't want [the] ole girl to get hemmed up for anything. I definitely don't want your . . . daughter to get all twisted up in anything man. You feel me?"

18

2. <u>Analysis</u>

First, we independently conclude the detectives' statements to defendant about Lopez and Beltran "get[ting] hemmed up" and "all twisted" in "anything" at best are ambiguous, as opposed to being an "implied threat[]" as defendant contends.

Second, the record in any event shows the detectives then knew that Lopez and Beltran had been at Monroy's house *at the time of the shooting*. Indeed, given defendant's story that he left Monroy's house *before* the shooting after arguing with Lopez, it was not then unreasonable for the detectives to suggest (or imply) that defendant's story was not matching the stories given by Lopez and Beltran, as summarized *ante*, and that as a result, someone was not telling the truth.

We find the case of *McWhorter* instructive. There, the defendant was charged with murdering a former next door neighbor and her son. (*McWhorter, supra,* 47 Cal.4th at p. 324.) The defendant committed the murders to steal $3,000 from the victims' apartment. As relevant here, the defendant in *McWhorter* claimed his confession was involuntary because police " 'threatened' to call his mother as a witness in the case unless he confessed. The matter arose when [police] told defendant the[y] . . . knew he was lying when he claimed he met his mother and borrowed $3,000 from her in Bakersfield on September 11. Defendant responded that he did not want his mother involved. [The police] at one point commented to defendant, 'Like I say, you know. Yes, we're gonna talk to your mom. Because, because you, you pulled her in this. I didn't pull her in this. You said that . . . you went down to meet your mom. Your mom gave you some money, lent you some money. . . . And you wanted me a while ago not to involve your mom.

19

Now if you stick with that story and you don't tell me why you did it, yeah, your mom's gonna be on the stand.  Because you pulled her in it.  I didn't.  I didn't make up your mom's, uh, name.  I didn't make up your mom's story.  So if you want her to ride this roller coaster with you because all of a sudden you're afraid of, of—[.]' "  (*Id.* at p. 348.)

In rejecting this claim, the *McWhorter* court explained:  "With regard to the comments about defendant's mother, we do not read [the police]'s remarks as 'threatening' to involve her as a witness in the case unless defendant confessed.  Rather, the officers, in essence, were telling defendant that by lying about having borrowed the money from his mother, *he himself was involving her in the case as a potential witness, which was an accurate observation*.  As the trial court observed in its lengthy ruling, 'by virtue of [defendant's] representations . . . the mother was quite anticipatorily a witness who could be a witness who would be available, necessary to impeach that particular information or contradict that information.  And of course, there's nothing that the Court can determine from that statement that is anything other than representation that that's not true and the mother is in a position to provide testimony that plans to meet the fact that—or any assertion that he received money from her was untrue.  [¶]  So the officers from time to time quite appropriately state as fact that because of comments he's made, representations of fact that Mr. McWhorter has made, as a result thereof he is bringing others into the picture, including his mother.  And certainly they challenge him to . . . change that information or admit that it's inaccurate information.  And there's nothing that the Court can determine that by virtue of those challenges and those statements that someone such as his mom could very well be a witness if that were the continuing presentation of fact

20

by the defendant, certainly is not a threat or an aspect of coercion that the Court finds or feels or determines is of such a nature that it reaches the legal standard of a threat such that it would make the statement obtained at any point involuntary.' " (*McWhorter*, *supra*, 47 Cal.4th at pp. 348-349, italics added.)

Similar to the facts in *McWhorter* where the defendant's story to detectives necessarily involved his mother in the police investigation of the murders, in our case defendant's story to detectives that he left *before* the shooting, after he and Lopez argued as a result of Lopez's alleged infidelity, necessarily put the stories provided by Lopez and Beltran at issue. That detectives reminded defendant that *he* was involving both Lopez and Beltran in their investigation was not a threat but instead an "accurate observation." (See *McWhorter*, *supra*, 47 Cal.4th at p. 349.)

In fact, the statements by detectives in our case are even more benign than those in *McWhorter* because, unlike the situation in *McWhorter* where the defendant's mother's involvement in the police investigation was based solely on the defendant's story (i.e., where he obtained the $3,000), in our case both Lopez and Beltran were witnesses to— and Lopez was *actively* involved in—the events leading up to the shooting. We thus independently conclude the statements about Lopez and Beltran "get[ting] hemmed up" and "all twisted" in the murder investigation were not coercive or otherwise improper. (Cf. *People v. Trout* (1960) 54 Cal.2d 576, 584-585 (*Trout*) [concluding a defendant's confession was coerced when police also held the defendant's wife in custody for the purpose of securing a confession from the defendant, even though police had no grounds to believe the defendant's wife was involved in or a suspect in the crime], overruled on

21

another ground as stated in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17; *People v. Rand* (1962) 202 Cal.App.2d 668, 670, 674 [reversing the conviction of the defendant based on coercive statements by a police officer who told the defendant if the defendant did not know who owned 35 marijuana cigarettes police found in his apartment after a warrantless search, the officer would have to arrest the defendant's wife and have their children "lock[ed] up" in juvenile hall].)

D. *The Second Interview*

1. Additional Background

This does not end our analysis, however. As noted, defendant was arrested following the first interview and was interviewed a second time. After giving defendant a *Miranda* warning, the following conversation took place:

Detective Avila: "[W]e got everybody else's story okay we want to hear Alex's story. So whatever you feel you need to start dude.

Defendant: "*If* I ask for an attorney now will I have one while we talk?

Detective Avila: "What's that?

Defendant: "*If* I ask for an attorney, you said I could have one while I'm being questioned right?

Detective Avila: "Yeah[.]

Defendant: "And that would happen right now?

Detective Avila: "*If* you ask for one. We're just trying to get your story dude, you got your, we got your wife's or your girlfriend's, we got your kid's story[.]

Detective Wijnhamer: "And you know what we really want to do Alex, is we want to get them separated from this. You know what I'm saying. This-this is not for them, this is not their deal, this is your deal bro. And it's-it's, it's hard I get that. It took a lot, it took a lot for, for your wife to tell us the truth, it took a lot well, your daughter is

22

just a special person you know so it wasn't but it-it-it took a lot and the one, the one thing I wanted to make sure that I told your wife and your . . . daughter . . . this is not their thing you know. We all make choices, we're all adults and we make our own choices. Unfortunately you-you got them involved you know what I mean and they-they don't need to be here, you know what I'm saying.

Defendant: "Yeah[.]"

The record shows detectives continued to question defendant and suggested Mena's disrespecting of defendant as a result of the "camera deal" made matters worse because defendant did not know Mena. At one point, defendant asked for something to eat and to see "his girls." Detectives agreed to give defendant something to eat but said he could not see "his girls" until they finished the interview. Shortly thereafter, the following conversation took place:

Defendant: "How fast could you have that lawyer here?

Detective Avila: "What's that?

Defendant: "How fast could you have a lawyer here?

Detective Avila: "I don't know how fast, we can dude. You get ah, my partner is gonna get the chips [to eat].

Defendant: "Can I have a Monster [to drink]?"

After giving defendant something to eat, the following conversation took place:

Defendant: "How do I get my girls out of this shit?

Detective Wijnhamer: "By the way you cooperate, that's how you're gonna get her out of it, out of this okay 'cause you set the crosshair okay, you set the crosshair. And unfortunately they were telling stories that weren't the truth okay and then they came around and then they told us the truth.

Defendant: "Okay.

23

Detective Wijnhamer: "Okay . . . now it's your turn dude and you know . . . that I know the story, I've already told you. I understand the disrespect, I understand . . . what you had to do, I understand that . . . you had get [*sic*] your wife's honor. I get that. Now are you gonna show your honor today and get your . . . daughter and your wife out of this, this crosshair, they don't need to be here.

Defendant: "Do, do they go home today?

Detective Wijnhamer: "That is up to you.

Detective Avila: "They will go home as soon as we're done.

Detective Wijnhamer: "100% up to you and I give you my word.

Defendant: "Can I get that in writing?

Detective Wijnhamer: "Absolutely.

Defendant: "Please and would I be able to see them before they leave?

Detective Wijnhamer: "Not now until you're done.

Defendant: "Before they leave.

Detective Wijnhamer: "I will.

Defendant: "Put it in writing please.

Detective Wijnhamer: "I Stan Wijnhamer will release your daughter and wife when you cooperate. Signed by me, my name. Put it in your pocket.

Defendant: "Is that official?

Detective Wijnhamer: "That is official. That is my name . . . and that is my signature." (Italics added.)

The record shows neither Lopez nor Beltran was at the police station during defendant's jailhouse interviews. The record further shows defendant next confessed to killing Mena, stating he shot Mena in self-defense when Mena ran at him.

24

2. Guiding Principles and Analysis

Preliminary, with respect to defendant's statements that, *if* he asked for an attorney, how long would it take detectives to provide one, it is well settled that after a valid *Miranda* waiver, "interrogation may proceed 'until and unless the suspect *clearly* requests an attorney.' " (*People v. Williams* (2010) 49 Cal.4th 405, 427.) This request for an attorney must be unequivocal and unambiguous. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 (*Gonzalez*), citing *Davis v. United States* (1994) 512 U.S. 452, 461-462 (*Davis*) [and noting "*Davis* now provides the standard by which we assess whether a defendant's reference to counsel constituted an unambiguous and unequivocal invocation of the right to counsel"]; *People v. Cunningham* (2015) 61 Cal.4th 609, 645 [noting an inquiry as to whether a defendant should " 'have somebody here talking for me' " is not an unequivocal invocation of the right to counsel].) Officers may, but are not required to, seek clarification of ambiguous post-*Miranda* invocations for counsel before continuing substantive interrogation. (*Cunningham,* at p. 646.)

Here, and after he waived his *Miranda* rights, defendant asked the detectives how long it would take to provide him counsel *if* he asked for an attorney. We conclude such statements by defendant were not an "unambiguous and unequivocal" invocation of his right to counsel. (See *Gonzalez*, *supra*, 34 Cal.4th at p. 1125.)

Defendant contends his confession was coerced because he was told by detectives that "if he did not cooperate, [Lopez and Beltran] would be kept in custody." However, as noted *ante*, the record shows that the detectives told defendant shortly after the second interview began that they wanted to "separate" defendant's "wife" (i.e., Lopez) and

25

"daughter" (i.e., Beltran) from the murder investigation; and that because of the circumstances, defendant "got them involved . . . and they-they don't need to be *here. . . .*" (Italics added.) Although defendant, from these statements, may have inferred Lopez and Beltran were in fact *then* at the station, the record does not support the conclusion that detectives told defendant they were in custody or that, unless he cooperated, they would remain in custody.

Nor do we consider these statements to be coercive. With regard to the statements that detectives wanted to "separate" Lopez and Beltran from the murder investigation and that this was not "their deal," as noted *ante* we conclude such statements were an "accurate observation" inasmuch as *defendant's* story that he left before the shooting necessarily put the conflicting stories of witnesses Lopez and Beltran regarding the events leading up to the shooting of Mena at issue in the murder investigation. (See *McWhorter*, *supra*, 47 Cal.4th at p. 349.)

With regard to the statement by detectives that Lopez and Beltran "don't need to be here," we conclude the use of the word "here" is ambiguous. Although the word "here" is defined as "in this place; in this spot or locality," it also is defined "at this point; at this juncture" and "under consideration, in this instance or case." (Random House Unabridged Dict. (2d ed. 1993), p. 894, col. 1.) Clearly, by this statement defendant assumed Lopez and Beltran were *then* at the station house, inasmuch as the record shows he asked several times during the second interview to see "his girls." Nonetheless, in our view it was not coercive for the detectives to use defendant's *own* assumptions, including incorrect ones, in questioning defendant, particularly under the circumstances of this case

26

when both Lopez and Beltran were involved in, and witnesses to, the events leading up to the shooting and when defendant denied any knowledge of the shooting. (See *People v. Hill* (1967) 66 Cal.2d 536, 549 [noting that " 'intellectual persuasion is not the equivalent of coercion' "].)

Defendant also contends his confession was coerced because in response to *his* question of "How do I get my girls out of this shit?" detectives told him "By the way you cooperate" because he "set the crosshair." He further contends detectives coerced him when, in response to his question, "[D]o they go home today?" the detectives stated, "That is up to you" and when they agreed to put in writing that they would "release [his] daughter and wife when [he] cooperate[s]."

Here, we conclude *defendant* and not the detectives initiated the "negotiation" that ultimately led to the "agreement" when defendant asked detectives, "How do I get my girls out of this shit?" At that point, as noted defendant was under the misconception that "his girls" where at the station house and that they were in custody. As also noted, defendant's misconception was based on ambiguous statements made by detectives that were not coercive, but rather were an "accurate observation" of the circumstances of their then-pending investigation, in which defendant gave a story that conflicted with the stories given by witnesses Lopez and Beltran. (See *McWhorter*, *supra*, 47 Cal.4th at p. 349.)

On this record, we conclude the detectives were not obligated to apprise defendant he was incorrect when he assumed "his girls" were then at the station house. Although the issue is closer, we also conclude detectives did not engage in coercive activity when

27

they agreed to put in writing what *defendant* wanted and asked for: that "his girls" could leave the station after he cooperated with police. (See *People v. Lee* (2002) 95 Cal.App.4th 772, 785 [noting "California courts have long recognized it is sometimes necessary to use deception to get at the truth" and further noting a " 'deception which produces a confession does not preclude admissibility of the confession *unless the deception is of such a nature to produce an untrue statement* ' "]; see also *People v. Barker* (1986) 182 Cal.App.3d 921, 930, 933 [noting an agreement between police and a defendant, in which the defendant stated he wanted to " 'square up everything . . . on [the] condition[] that [the police] drop all holds on my old lady,' " to which a police officer responded, " 'OK, I can, I can deal,' " did not render a subsequent confession inadmissible because the "subject of leniency for friends or relatives was initiated by the [defendant] rather than the authorities"].)

Finally, even if defendant's confession should not have been admitted because it was involuntary, any error was harmless beyond a reasonable doubt. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 295; *People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).)

Indeed, as summarized *ante*, there is overwhelming evidence *other* than the confession supporting the finding defendant was guilty beyond a reasonable doubt, including evidence that shortly before the shooting, Mena had been rude and disrespectful to Lopez in connection with the "camera incident"; that Lopez told defendant about Mena's inappropriate behavior toward her; that Lopez wanted defendant to fight Mena as a result; that defendant next confronted Mena inside the house, where Beltran heard the two men having a disagreement; that Mena, Lopez, and defendant next

28

went outside and, shortly thereafter, only Lopez returned inside; that when Monroy noticed the porch light to the house had been turned off, he opened the door and heard defendant and Mena "having a disagreement"; that Monroy's neighbor also heard a disagreement between two men shortly before the shooting; that defendant had a gun with him on the night of the shooting; that while outside, defendant used his phone to contact Lopez and inform her he was going to fight Mena in a field; that shortly thereafter, witnesses heard multiple gunshots; that Mena's body was found in a field; that after hearing the gunshots, Monroy's neighbor went outside, crouched down and saw one of the men who had been arguing run past him; that defendant used his phone a second time to contact Lopez and tell her to leave the house; that in response, Lopez and Beltran abruptly left the house without defendant and without Beltran getting a matching tattoo; that Lopez told Beltran on the drive home "not to say anything to anyone" and to say she "did not know anything"; that police found ammunition in the garage of the residence where defendant lived that had the *same* headstamp as each of the expended bullet casings found at the murder scene; that police also found a shoebox and a receipt for a *pair* of K-Swiss men's shoes, size seven and a half, and the sole of the shoes visibly matched the "K-Swiss" impressions—including the word "K-Swiss"—that were found in the dirt at the murder scene; and that when Monroy called defendant after Monroy could not reach his good friend Mena, defendant claimed Mena received a phone call and walked away.

29

Based on this evidence, we independently conclude even if the court erred in admitting defendant's confession, that error was harmless beyond a reasonable doubt. (See *Neal*, *supra*, 31 Cal.4th at p. 86.)

II

Gang Enhancement

Defendant next contends the true finding on the gang enhancement in count 2 must be reversed for lack of substantial evidence.

A. *Guiding Principles*

The inquiry under the substantial evidence standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Reilly* (1970) 3 Cal.3d 421, 425.)  "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.  [¶] . . .  A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' "  (*People v. Morris* (1988) 46 Cal.3d 1, 21, disapproved on another ground as stated in *In re Sassounian* (1995) 9 Cal.4th 535, 543, 545, fns. 5, 6.)  A trier of fact may rely on inferences to support a conviction only if those inferences are "of such

30

substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true. (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

Section 186.22, subdivision (b)(1) provides in relevant part: "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows . . . ."

It is well established that there are two " 'prongs' " to this enhancement. (*People v. Albillar* (2010) 51 Cal.4th 47, 65.) First, the prosecution is required to prove that the underlying felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) Second, there must be evidence that the crimes were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Ibid.*; see *Albillar*, at p. 59.)

The case of *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*) informs our decision on this issue. There, a lone gang member committed a carjacking. Based on the defendant's tattoos and admissions, the prosecution's experts testified that the defendant was a gang member and that he committed the carjacking for the benefit of the gang. (*Id.* at pp. 654-656.) In reversing the true finding on the gang enhancement, the *Ochoa* court found that "[t]here was no evidence that *only* gang members committed carjackings or that a gang member could not commit a carjacking for personal benefit, rather than for the benefit of the gang." (*Id*. at p. 662.) The court also focused on the absence of

31

evidence, stating:  the defendant "did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses.  There was no evidence of bragging or graffiti to take credit for the crimes.  There was no testimony that the victim saw any of defendant's tattoos.  There was no evidence the crimes were committed in [the defendant's gang's] territory or the territory of any of its rivals.  There was no evidence that the victim of the crimes was a gang member or a [gang] rival.  Defendant did not tell anyone . . . that he had special gang permission to commit the carjacking.  [Citation.]  Defendant was not accompanied by a fellow gang member."  (*Ibid*., fn. omitted.)

B. *Analysis*

Here, respondent argues the evidence is sufficient to support the gang

enhancement because "[defendant] was a long[-]term member of Southside Colton, had

gang tattoos, willingly displayed his gang tattoos, wore clothing that promoted his gang,

and habitually walked around with a gun," and because an expert testified that it was

"important . . . for gang members to be violent in order to instill fear . . . in victims."  We

conclude this evidence is insufficient to support the finding defendant possessed a gun for

the "benefit of"[4] a criminal street gang.

Here, the record shows defendant showed Mena his tattoos on the night of the

murder, which ostensibly included the "SC" tattoo on his abdomen that a gang expert

opined stood for the Southside Colton criminal street gang.  The record also shows that

same night defendant wore a hat with the letter "C," which the expert opined also stood

for Southside Colton.

That defendant would show Mena his tattoos on the night of the murder was

hardly surprising, however, given that Monroy was in fact a tattoo artist; that Monroy and

Mena were good friends; that Monroy had tattooed defendant a few months earlier with

---

4       We note in closing argument the prosecution argued there was no evidence counts
1 and 2 were committed "at the direction of, or in association with" a criminal street gang
for purposes of section 186.22, subdivision (b)(1).  Rather, the record shows the
prosecution argued if this enhancement applied, it was because the underlying felonies
"benefit[ed]" the gang.  We further note that the prosecution spent considerable time
arguing how the murder in count 1 benefited the Southside Colton gang, but only
mentioned *briefly* how count 2, the charge of a felon in possession of a firearm, benefited
the gang.  In any event, as noted the jury was unable to return a true finding on the gang
enhancement in connection with count 1.

33

the words, "Wasted [D]ays and [W]asted [N]ights," which ostensibly was not a gang-related tattoo, as defendant explained these words were from a song his grandfather liked; and that defendant had taken Lopez and Beltran to Monroy's house that night *specifically for the purpose of obtaining matching tattoos*.

In addition, it appears the murder and possession charges were not committed in Southside Colton gang territory, inasmuch as Monroy lived in a rural neighborhood in Hesperia. There also was no evidence that Mena or Monroy were from a rival gang of Southside Colton, or that defendant called out a gang name, displayed gang signs or otherwise referred to the Southside Colton criminal street gang in connection with count 2.

In contrast to the lack of evidence in the record to show defendant committed count 2 for the benefit of the gang, there is overwhelming evidence in the record supporting the finding that defendant committed the murder and possessed the gun for his *personal* benefit, inasmuch as the dispute between him and Mena was in fact highly personal after Mena disrespected Lopez, whom defendant referred to as his "wife." Indeed, before Mena disrespected Lopez, it does not appear there had been any problems or issues between defendant and Mena before the murder.

Although it is true defendant wore a hat with the letter "C" on it on the night of the murder, we conclude the hat is insufficient evidentiary support on which an expert could base his or her testimony that defendant carried the gun on the night of the murder to "benefit" the Southside Colton criminal street gang. (See *Ochoa*, *supra*, 179 Cal.App.4th at p. 657 [noting a "gang expert's testimony alone is insufficient to find an offense gang

34

related" and further noting the " 'record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of . . . a criminal street gang' "].)

## DISPOSITION

The conviction on the gang enhancement attached to count 2 is reversed. The trial court is directed to prepare an amended abstract of judgment to reflect this change and to forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


PRAGER, J.*

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

35